Wayne **DOLCEFINO** and **KTRK Television, Inc.,** Appellants,

v.

Sylvester **TURNER,** Appellee.

No. 14–97–240–CV

Court of Appeals of Texas,
Houston (14th Dist.).

Dec. 30, 1998.

Rehearing Overruled March 25, 1999.

Charles L. Babcock, David Timothy Moran, Houston, for appellants.

Ronald G. Franklin, Ralph S. Carrigan, Robert E. Lapin, Houston, for appellee.

## OPINION

ANDERSON, Justice.

This appeal is from a jury verdict against Wayne Dolcefino and KTRK Television, Inc. (KTRK) in Sylvester Turner's libel suit. The suit arose out of two television news broadcasts aired on KTRK's Channel 13 on December 1, 1991, at 5:30 p.m. and 10:00 p.m., days before the run-off election for mayor of Houston between Turner and Bob Lanier. The broadcasts questioned the role Turner may have played in, and what he knew about, an attempted multi-million dollar insurance scam. The scheme involved one of Turner's clients, Sylvester Foster, who had reportedly drowned in 1986 while sailing near Galveston, but was in fact still alive. Appellants bring eighteen issues on appeal, asserting the following: the complained of statements are true or otherwise not actionable; there is no clear and convincing evidence of actual malice; exemplary damages are improper; there were prejudicial errors in the jury charge; and, there were prejudicial errors on evidentiary rulings. We agree that there is no clear and convincing evidence of actual malice. Accordingly, we reverse and render.

## I. Background

Turner is a Harvard-educated attorney, licensed to practice in Texas. During the events at issue in this suit, he was a name partner in the Houston law firm of Barnes, Morse & Turner. In late 1985, his life-long friend, Dwight Thomas, introduced him to Sylvester Foster, who had been a male model and was the owner of several beauty salons and a male modeling studio in Houston. In May of 1986, Turner began drafting Foster's will, in which Foster appointed Thomas executor of his estate. The will was completed and ready to be executed the week of June 16, 1986, and Foster executed the will on

June 19, 1986. Turner was not present and one of his law partners handled the execution of the will.

Just days later, Turner learned Foster had apparently fallen overboard during a sailing trip and was presumed to have drowned on June 22, 1986. No body was found. On June 28, 1986, Foster's father, Clinton Foster, and Thomas, met with Turner and asked that Turner probate the Foster will. In July, Turner notified various life insurance companies of Foster's death. On August 13, 1986, the U.S. Coast Guard issued a formal report, concluding that Foster was "presumed dead and lost at sea." Turner filed an application in Harris County to probate the will on November 21, 1986. On December 15, 1986, Prudential Insurance Company intervened in the probate proceeding and presented evidence that Foster had faked his death. The parties then undertook substantial discovery, including deposition testimony, in the contested probate proceeding.

On July 1, 1987, Foster's father, Clinton Foster, intervened in the probate case. After several requests that Turner withdraw from the case, Clinton Foster's attorneys filed a motion to disqualify Turner and his law firm, arguing that Turner would likely be a fact witness because he had drafted the will. The court disqualified Turner and his firm pending resolution of the will contest. Richard Snell was named temporary administrator of the estate. Turner submitted his bill for $28,000 for legal work performed on the Foster matter.[1] The bill was rejected as not "timely filed."

The probate court ordered Snell, the estate's new administrator, to begin an investigation to determine if Foster was dead. Snell requested the court appoint Elizabeth Colwell, a former investigator for Clyde Wilson who was then employed by Bill Elliott, to attempt to locate Foster. After an almost two-year search, she was unable to locate Foster. On April 12, 1989, the probate court entered a formal order declaring Foster dead. Clinton Foster then filed suit against

---

1. The bill from Turner's law firm reflects a total of 248.25 hours billed on the Foster probate case.

several insurance companies, seeking $1.2 million in benefits, plus punitive damages for their bad faith in refusing to pay his claims on the life insurance policies covering his son's life.

Clinton Foster settled one suit, accepting $125,000 from National Western Life Insurance Company, on the condition that if his son were ever found alive, he would return the money. On June 20, 1989, the U.S. Embassy informed Clinton Foster that his son was indeed alive and in prison in Spain.[2] Clinton Foster refused to return the settlement funds to National Western and filed bankruptcy, claiming the settlement funds had been used to pay his attorney, Carston Johannsen.

Meanwhile, Turner had been elected in 1988 to serve in the Texas House of Representatives, and later, he decided to enter the 1991 race for the office of Mayor of the City of Houston. It was a three-way race among Turner, the incumbent Mayor Kathy Whitmire, and Bob Lanier. In the general election on November 5, 1991, Lanier received 43.72 percent of the vote, Turner 35.91 percent, and Whitmire 20.12 percent. The runoff between Lanier and Turner was set for December 7, 1991.

On the Wednesday before Thanksgiving, November 27, 1991, Tom Doerr, the KTRK news director, asked Dolcefino to investigate a news tip the station had received. Clyde Wilson, a private investigator, suggested to Shara Fryer, a Channel 13 news anchor, that KTRK investigate an attempted insurance swindle involving Sylvester Foster. Wilson informed Fryer that Turner had drawn up Foster's will shortly before Foster's disappearance, and Turner had been involved in efforts to obtain life insurance benefits. Fryer passed the information on to Dolcefino, who also knew Wilson and had used him as a source for fifteen years.

That same day, Dolcefino had lunch with Peary Perry, a private investigator who also

was a member of Bob Lanier's campaign finance committee. Perry provided Dolcefino with a one-page summary concerning Foster's disappearance and his relationship to Turner, which Turner refers to as a "script" for the story.[3] Documents from the Foster probate file were delivered to Channel 13 that afternoon, apparently on Perry's instructions.

Dolcefino investigated the tip and confirmed Foster was alive and in a Spanish prison on drug charges under the alias, Christopher Laurent Fostier. Dolcefino contacted Bill Elliott, a private investigator whose firm had investigated Foster's disappearance and had been retained by the lawyer for Turner's estranged wife, Cheryl. Elliott told Dolcefino Turner was sharing a house with Dwight Thomas, who was involved with Foster. Elliott also told Dolcefino that he believed there was a conspiracy to stage Foster's disappearance and that Turner was involved in it. Elliott gave Dolcefino a copy of Foster's obituary, a program from his memorial service showing Turner delivered a eulogy, handwritten notes indicating $6.5 million in insurance policies on Foster's life, and a letter to Foster's father from an embassy official in Spain. Elliott also showed Dolcefino a copy of an affidavit from Cheryl Turner, which discussed, among other matters, the couple's financial problems.

Dolcefino also reviewed the documents from the Foster probate file delivered to the station on Wednesday. Included were several depositions that Turner attended. Among them was the deposition of Russ Reinders, a Foster business associate who, along with Keith Anderson, had been on the sailboat outing with Foster, and each signed an affidavit, in Turner's office, falsely attesting that Foster had fallen overboard in Galveston Bay on June 22, 1986. The records also showed Turner had been involved in the execution of a partnership agreement for the RU/Sly

---

**2.** Upon confirmation that Foster was alive, the probate court rescinded its order declaring Foster dead and closed the probate file.

**3.** Shortly before trial, the First Court of Appeals denied mandamus relief to Dolcefino concerning

an order to answer questions about information given to him by his confidential informant, Peary Perry. *See Dolcefino v. Ray*, 902 S.W.2d 163 (Tex.App.—Houston· [1st Dist.] 1995, orig. proceeding).

(pronounced "Are You Sly") Partnership between Foster and Reinders.[4]

The court records painted a picture of Foster's questionable background. Foster was arrested in Las Vegas two months before his disappearance. Jay Bly, a Secret Service agent who had investigated Foster, testified by deposition that Foster and Thomas were engaged in a "chop shop" scam. Foster drove Thomas' Porsche to Las Vegas to have the car dismantled and sold for parts while Thomas planned to collect insurance proceeds on the Porsche, which had been reported stolen.

Foster had also been investigated by the Secret Service for credit card fraud, and he was indicted in Houston on June 13, 1986. Agent Bly attempted to take Foster into custody the night before Foster signed his will in Turner's office, but Foster promised he would turn himself in the following day. Instead, Foster left on a sailing trip. Foster was considered a fugitive from justice at the time of his disappearance.

Additional suspicious circumstances were revealed. Not only had Foster taken out several life insurance policies in the months before his disappearance, he also bought a new Mercedes, a BMW, and a Ford Mustang, all with credit life insurance, in the month before he signed his will. Foster had also applied for an emergency passport just two weeks before his disappearance.

The records also documented Turner's involvement in the Foster case. The court records received by Dolcefino included Turner's deposition, in which he described Foster's will and its preparation and execution. Turner drafted Foster's will, attempted to have the will probated, and represented Thomas as the named executor in the probate proceeding before he was disqualified.[5] Turner corresponded with many of the life insurance companies in an attempt to get them to pay on the policies. Turner's bill for his services in the Foster probate case, which showed Turner spent 125 hours of his time on the case, was rejected by the court. The affidavits of Reinders and Anderson attesting that Foster had fallen overboard were signed in Turner's office.

On Thanksgiving morning, Dolcefino and a cameraman went to the Turner/Thomas home to interview Thomas. Dolcefino first spoke to Turner outside the home. In response to Dolcefino's statement that Foster was alive and in prison in Spain, Turner said that was the first he had heard of it, but he expressed no curiosity about the matter. Thomas also answered Dolcefino's questions and denied any knowledge that Foster was alive. He also claimed that he and Turner would not have dealt with Foster at all "if we had known that he was doing something out of the ordinary beyond the premise of the law." This assertion caused Dolcefino to question Thomas' credibility because he had learned about the chop shop scam from the probate records.

Dolcefino spoke to other sources on Thursday and Friday. He interviewed Jeffrey Wayne Fry, a Foster business associate with a criminal background, who confirmed Foster was involved in criminal activity. Fry also confirmed the total amount of Foster's insurance policies was $6.5 million. When questioned about whether Turner knew of the scam beforehand, Fry said that Turner "had to know. There is no way that he could not have known."

Dolcefino again interviewed Turner extensively on Friday. Turner denied any involvement in the Foster scheme, and he also denied any problems in his personal life. Dolcefino did not believe Turner because of Cheryl Turner's affidavit. Turner encour-

---

4. According to the agreement, the partnership planned to purchase a boat, Foster and Reinders each agreed to purchase $150,000 in insurance on the life of the other, and if one of them died, the other would collect the insurance proceeds and would own the boat and the business. The policy on Foster's life contained a double indemnity provision in case of accidental death. Thus, Reinders stood to gain $300,000 in insurance proceeds from Foster's death.

5. Turner places significance on the fact that the probate documents Dolcefino reviewed before the broadcasts did not include Foster's will. As discussed, however, the records Dolcefino reviewed did include Turner's probate deposition in which Turner explained the will, its beneficiaries and Foster's life insurance.

aged appellants to check out the insurance fraud story, and he thought he had satisfied the station's concerns. He left the interview believing the proposed story would not portray him negatively.

Dolcefino also spoke to Elizabeth Colwell, the court-appointed investigator in the Foster matter. She told Dolcefino that Turner was aware of the insurance fraud conspiracy, he refused to cooperate in her investigation, there was $6.5 million in insurance money, Turner attempted to block questioning of Foster's girlfriend, Turner was involved in attempts to get insurance companies to pay off, Turner represented Foster, his girlfriend Christina Batura, and others, and Turner was "in it up to his eyeballs." Colwell testified at trial that she confirmed to Dolcefino the truth of every statement in the broadcasts about which Turner complains.

Dolcefino spoke with Secret Service Agent Bly, who also told Dolcefino that· Turner attempted to block the questioning of Foster's girlfriend and that there was $6.5 million in insurance on Foster. He also agreed Turner was uncooperative in the investigation.[6]

Dolcefino unsuccessfully attempted to speak with Foster, who was in prison in Spain. He also was unsuccessful in his attempt to reach Jim McConn, Jr., the attorney for Prudential Insurance Company, which had intervened in the probate case and alleged that Foster was not dead.

Dolcefino prepared his script for the broadcast on Saturday and revised it on Sunday. He spoke to Turner's press secretary, Rickie Rosenberg, several times. He asked for any response to contradict the story and was given none. Several hours before the 5:30 p.m. broadcast, Dolcefino again called Rosenberg to see if Turner had anything to say to rebut the story. He gave Rosenberg the details of the proposed story. Again, Turner provided nothing in response.

The first story aired on Sunday, December 1, 1991, at 5:30 p.m.[7] The broadcast opened with the following: "We begin tonight with word of what may be one of the biggest attempted insurance swindles in recent Houston history, the apparent conspiracy to fake the death of a 30–year old Houston man with criminal troubles and millions of dollars in life insurance." Dolcefino followed with the question: "What role did Houston mayoral candidate, Sylvester Turner, play in this tale of multi-million dollar fraud?" Dolcefino added: "Our focus, what did Sylvester Turner know and when did he know it?" The story told of Foster's disappearance: "It was June of 1986, and 30–year old Sylvester Clyde Foster, a male model and beauty salon owner, had died in a freak accident. Two companions claimed Foster had fallen off a sailboat and into the waters of the Gulf of Mexico six miles south of Galveston. The Coast Guard searched but the body was never found. This week, 13 Undercover learned Sylvester Foster was very much alive and in prison in Salamanca, Spain, under an alias, Christopher Laurent Fostier. Fostier had been arrested after allegedly delivering two kilos of cocaine to a Spanish undercover agent. Dwight Thomas was said to be Foster's closest friend here in Houston."

The story then described the efforts to probate Foster's estate and obtain life insurance benefits. "Both Dwight Thomas and Sylvester Turner were deeply involved in the Sylvester Foster case and the attempt to get life insurance companies to pay off 6.5 million dollars in the wake of the disappearance. But did they know it was all a hoax, a scheme to swindle millions?" Both Thomas and Turner denied, on camera, any involvement in the attempted scam, and Thomas asserted they would have had nothing to do with Foster if they had known anything illegal was involved. "But Thomas and Turner did deal with Sylvester Foster, even after learning he was the target of criminal investigations in early 1986, and they pursued the

---

6. Evidence at trial shows the Secret Service had listed both Turner and Thomas as suspects in the Foster insurance conspiracy. The United States Attorney's office declined to prosecute them, citing "evidence, though credible, is not sufficiently corroborated to convict," largely because of the deaths of several of the participants in the

scheme. Reinders, Anderson, and Batura had all died by that time.

7. Transcripts of the broadcasts are attached as an appendix.

estate money even after significant evidence of a possible scam in Foster's death had already surfaced. Dwight Thomas introduced Foster to his friend, attorney Sylvester Turner, in early 1986. And in June of that year, Turner drew up a will for Foster; the timing interesting. On June 13th, Sylvester Foster was indicted by a Houston federal grand jury for massive credit card fraud. On June 19th, Foster rushed to sign the will in Turner's office, leaving the next day for a sailboat trip in the Gulf, despite what friends called his fear of the water. June 22nd, nine days after the indictment, three days after drawing up the will, Foster supposedly falls off the boat in another boat's wake and drowns. Curious? Get this: In the weeks before the bizarre accident, Foster had applied for an emergency passport, bought several luxury cars with life insurance policies attached, and amassed millions in life insurance coverage. Despite the signs of something fishy, Sylvester Turner began the legal effort to get the millions in insurance money released and get mutual friend, Dwight Thomas, appointed as administrator over the estate."

The broadcast then referred to Turner's involvement in the investigations into Foster's disappearance. "Turner also tried to block questioning of a female friend of Foster's in this case, Christina Batura, a woman promised a share of the money in the will. Batura died two years ago in an Hawaiian commuter plane crash, and Secret Service investigators now confirm they found letters and pictures that proved Batura knew Foster was alive, as she tried to collect on his death, and Turner helped her." Dolcefino acknowledged that Turner asserted he "fully cooperated with all of the investigations into Foster's disappearance, but at least three investigators very close to this case tell us that's simply not true." Turner claimed he was also a victim of the scam, and he was left with unpaid legal bills after the probate judge removed him from the case. Dolcefino responded, "But if that's true, then Sylvester Turner was duped by overwhelming evidence and at least two legal clients with close ties to one of his closest friends."

After the first broadcast, Turner called a news conference for 8:00 p.m. to refute the story. With him at the news conference were the presiding probate judge for the Foster case, John Hutchison, and Jim McConn, the attorney for the principal insurer among the several life insurance companies contesting payment to Foster's beneficiaries. Both indicated they did not believe the charges against Turner, and they stated Turner's conduct in the probate proceeding had been nothing but professional. KTRK sent reporter Mary Ellen Conway to cover the press conference, and she testified she immediately returned to the station and gave Dolcefino her notes and tape.

The station did not air Hutchison's and McConn's statements during its 10:00 p.m. rebroadcast of the Foster story. The 10:00 newscast included a denial from Turner with his statement that the story represented "an all time low in Houston politics," and a charge that the story was furnished to Channel 13 by Bob Lanier's campaign. The newscast also included a videotaped denial from Lanier's campaign manager, Craig Varoga, obtained by Conway after she gave Dolcefino the original press conference footage. Varoga stated: "I think it's ridiculous that every time there is a story in the newspaper or on TV that raises serious questions about Sylvester Turner's public record, that he blames the Bob Lanier campaign." The segment concluded with the statement: "Reporter Wayne Dolcefino and Channel 13 stand by the story."

Other Houston stations aired the Hutchison and McConn statements. Dolcefino blamed the omission on Conway, and the station aired the comments the next day. Jim Masucci, the station's general manager, later referred to the omission of the Hutchison and McConn remarks as a "goof up" by the reporter covering the press conference.

Following the December 1st broadcasts, questions continued about who was the source of the story. Channel 13's news director, Tom Doerr, who knew Dolcefino had a confidential source, asked him if there was a political connection. Dolcefino denied there was such a connection. He explained he did not know if his confidential source was

connected to a campaign, but it did not appear that he was. Turner contends, however, Dolcefino knew Perry was "on the Lanier side of the equation." Dolcefino falsely told other reporters the source was Turner's estranged wife, Cheryl. Tom Doerr asked Clyde Wilson to come forward and acknowledge that he was Channel 13's source for the story. Wilson agreed. The evening newscast on December 5, 1991, included the statement, "Channel 13 has never revealed the source of its story, but today in a surprise move, the real source of the story stepped forward. Clyde Wilson dropped a bombshell today by admitting he leaked the story to Channel 13." Shara Fryer also stated, "Sylvester Turner refused to apologize to Bob Lanier today, though Turner had accused the Lanier campaign of providing the information contained in the Eyewitness News report."

Turner contends his campaign went into a "free fall" after the broadcasts, and he lost the election. He then filed this suit, contending the broadcasts were false, made with malice and that Dolcefino and KTRK's management entered into a conspiracy to cover up the true source of the story. At trial, Turner cited the following thirteen specific statements in the broadcast as false and defamatory: [8]

1. Sylvester Turner w[as] deeply involved in the Sylvester Foster case and the attempt to get life insurance companies to pay off $6.5 million in the wake of the disappearance.

2. Turner did deal with Sylvester Foster, even after learning he was the target of criminal investigations in early 1986, and they pursued the estate money even after significant evidence of a possible scam in Foster's death had already surfaced.

3. And in June of that year, Turner drew up a will for Foster; the timing interesting.

4. On June 19th, Foster rushed to sign the will in Turner's office.

5. June 22nd, nine days after the indictment, three days after drawing up the will, Foster supposedly falls off the boat in another boat's wake and drowns.

6. Despite the signs of something fishy, Sylvester Turner began the legal effort to get the millions in insurance money released and get mutual friend, Dwight Thomas, appointed as administrator over the estate.

7. Turner also tried to block questioning of a female friend of Foster's in this case, Christina Batura, a woman promised a share of the money in the will.

8. Batura died two years ago in an Hawaiian commuter plane crash, and Secret Service investigators now confirm they found letters and pictures that proved Batura knew Foster was alive, as she tried to collect on his death, and Turner helped her.

9. Sylvester Turner pursued the estate for a year, until a judge removed him from the case over Turner's protest, citing conflicts of interest.

10. In November of 1987, Turner tried to collect more than $28,000 in legal fees from the still unsettled estate for his work.

11. The bill was rejected.

12. But if that's true, then Sylvester Turner was duped by overwhelming evidence and at least two legal clients with close ties to one of his closest friends.

13. Sylvester Turner claims he fully cooperated with all the investigations into Foster's disappearance, but at least

---

**8.** Turner also complained that some of the graphics used in the broadcast were defamatory. For example, he complained the visual impact of a triangle showing photographs of Turner, Foster and Thomas at the three points defamed him. Conversely, we note that the broadcasts also depict the extreme lack of credibility shown by Thomas, Turner's "life-long friend," in his deni-

als of knowledge that Foster was alive and in prison in Spain. Thomas admitted at trial that he had been told by Jon Nelson, a Foster acquaintance, that Foster was alive. Keith Anderson also testified about conversations he had with Thomas in 1990 about Foster being alive and in prison in Spain.

three investigators very close to this case tell us that's simply not true.

After a six-week trial, the jury found the broadcasts were defamatory, false, published with actual malice, authorized by KTRK, and published with actual awareness of probable harm to Turner's reputation. The jury determined Turner's actual damages were $550,000 and that exemplary damages in the amount of $4,500,000 should be awarded against KTRK and $500,000 against Dolcefino. The trial court limited the exemplary damages against KTRK to $2,200,000, four times the actual damages, as required by section 41.007 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.007 (Vernon 1988). This appeal resulted.

## II. Defamation

■ Libel is a defamatory statement, expressed in written or other graphic form, which tends to injure a person's reputation, "and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation or to publish the natural defects of anyone and thereby expose the person to public hatred, ridicule, or financial injury." TEX. CIV. PRAC. & REM. CODE ANN. § 73.001 (Vernon 1997).[9] The broadcasting of defamatory statements read from a script constitutes libel rather than slander. *See Christy v. Stauffer Publications, Inc.*, 437 S.W.2d 814, 815 (Tex.1969). Whether words are capable of the defamatory meaning the plaintiff attributes to them is a question of law for the court. *See Musser v. Smith Protective Serv., Inc.*, 723 S.W.2d 653, 654–55 (Tex.1987). We must construe the statement as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive the entire statement. *Id.* at 655.

■ Our state libel laws are limited by the constitutional guarantees of freedom of speech and freedom of press within the First Amendment. *See Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 30, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971). A showing by the defendant of the substantial truth of its broadcast will defeat the plaintiff's cause of action and entitle the defendant to judgment. *See McIlvain v. Jacobs*, 794 S.W.2d 14, 16 (Tex. 1990); *see also* TEX. CIV. PRAC. & REM.CODE ANN. § 73.005 (Vernon 1997) ("The truth of the statement in the publication on which an action for libel is based is a defense to the action."). The test used in deciding whether the broadcast is substantially true involves consideration of whether the alleged defamatory statement was more damaging to the plaintiff's reputation, in the mind of the average listener, than a truthful statement would have been. *See McIlvain*, 794 S.W.2d at 16. "This evaluation involves looking to the 'gist' of the broadcast. If the underlying facts as to the gist of the defamatory charge are undisputed, then we can disregard any variance with respect to items of secondary importance and determine substantial truth as a matter of law." *Id.* This court has recently interpreted *McIlvain* to require only proof that third party allegations reported in the questioned broadcast were in fact made and under investigation in order to prove substantial truth; media defendants need not demonstrate the underlying allegations are substantially true. *See KTRK Television v. Felder*, 950 S.W.2d 100, 106 (Tex.App.— Houston [14th Dist.] 1997, no writ).[10]

**9.** In his brief, Turner concedes that "a careful reading of the broadcasts reveals that most statements they contain do not 'relate to' Sylvester Turner at all." These statements cannot be defamatory as to Turner. A cause of action for libel accrues if the defendant publishes a false, defamatory statement of fact *of and concerning* the plaintiff. *See Hanssen v. Our Redeemer Lutheran Church*, 938 S.W.2d 85, 92 (Tex.App.— Dallas 1996, writ denied).

**10.** The central premise of Turner's argument on appeal is that the broadcasts charged that he "was a knowing participant in a multi-million dollar fraud." Turner does not quote any statement from the broadcasts where such an accusation can be found, but instead, he argues that the "gist" of the entire broadcast was that Turner was a knowing participant in a criminal conspiracy. *See Golden Bear Distrib. Sys. of Texas, Inc. v. Chase Revel, Inc.*, 708 F.2d 944, 948–49 (5th Cir.1983) (rejecting the defense of truth where the juxtaposition of truthful statements created on overall defamatory effect through the omission of other facts that would have refuted the false impression). Appellants assert that to give credence to Turner's assertion would require recognition of "libel by implication." At trial, Tur-

### III. The Actual Malice Standard

 There is no dispute in this case that Turner, as a sitting state representative and a candidate for mayor of the fourth largest city in the United States, is a public official. Public officials must establish a higher degree of fault than private individuals to recover for defamation. *See WFAA–TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (1998). To sustain a defamation cause of action, a public official must prove that the defendant (1) published a statement; (2) that was defamatory concerning the public official or public figure; and (3) that the false statement was made with actual malice. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Casso v. Brand*, 776 S.W.2d 551, 555 (Tex. 1989); *Channel 4, KGBT v. Briggs*, 759 S.W.2d 939, 941 (Tex.1988). The United States Supreme Court established the "actual malice" standard for public officials in *New York Times*, recognizing "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, in that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." 376 U.S. at 270, 84 S.Ct. 710.

 For purposes of First Amendment litigation, "actual malice" requires that the defamatory statement be made with knowledge that the utterance was false or with reckless disregard of its truth or falsity. *See New York Times*, 376 U.S. at 280, 84 S.Ct. 710. "Reckless disregard" means that the publisher "in fact, entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 334 n. 6, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

Negligence, such as failure to investigate, does not constitute actual malice. *See St. Amant*, 390 U.S. at 733, 88 S.Ct. 1323. In addition, evidence of ill will or spite is not evidence of actual malice under defamation law. *See Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991).

 Where, as here, the defamatory statements involve "core" speech that bears directly on a political candidate's fitness and qualifications for office, these principles are heightened. *See Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 686–87, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). The United States Supreme Court has written that there is little doubt that "public discussion of the qualifications of a candidate for elective office presents what is probably the strongest possible case for application of the *New York Times* rule." *Ocala Star–Banner Co. v. Damron*, 401 U.S. 295, 300, 91 S.Ct. 628, 28 L.Ed.2d 57 (1971). The *Harte–Hanks* Court emphasized that:

> [w]hen a candidate enters the political arena, he must expect that the debate will sometimes be rough and personal and cannot "cry Foul!" when an opponent or an industrious reporter attempts to demonstrate that he lacks the "sterling integrity" trumpeted in the campaign literature and speeches. Vigorous reportage of political campaigns is necessary for the optimal functioning of democratic institutions and central to our history of individual liberty.

491 U.S. at 687, 109 S.Ct. 2678 (citations and internal quotations omitted).

The Texas Supreme Court has repeatedly recognized that the Texas Constitution provides greater rights of free expression than its federal equivalent.[11] *See Cain v. Hearst*

---

ner's counsel abandoned that theory, acknowledging it was not plead and stating Turner did not "intend to rely on libel by implication to support a judgment in this case, period, end of discussion." In addition, the charge explicitly instructed the jury to "consider the actual language used in the broadcasts" and not "any implied statements or inferences." Instead, according to appellants, the broadcasts examined events that bore upon Turner's fitness and qualifications to be mayor of Houston and asked what role Turner played in the scheme. Rather than charging that Turner knowingly participated in

the fraudulent scheme, the broadcast questioned what Turner may have known, the timing of his knowledge of certain facts, and whether he was "duped" by participants in the scheme. Because of our disposition of the actual malice issue, we need not resolve whether appellants may be held liable for defamatory implications in the broadcast.

11. Article I, section 8 of the Texas Constitution provides:

Every person shall be at liberty to speak, write or publish his opinions on any subject, being

*Corp.*, 878 S.W.2d 577, 584 (Tex.1994); *see also Davenport v. Garcia*, 834 S.W.2d 4, 8 (Tex.1992) (noting the continued inclusion in our state constitution of "an expansive freedom of expression clause and rejection of more narrow protections indicates a desire in Texas to ensure broad liberty of speech"); *O'Quinn v. State Bar of Texas*, 763 S.W.2d 397, 402 (Tex.1988) (concluding "it is quite obvious that the Texas Constitution's affirmative grant of free speech is more broadly worded than the first amendment"). For these reasons, the Texas Supreme Court has consistently held that proof of actual malice requires sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of the publication.[12]

## IV. Standard of Review

We are required to make an independent assessment of the record to determine if actual malice was established by clear and convincing evidence. *See Bose Corp. v. Consumers Union of the United States, Inc.*, 466 U.S. 485, 501, 510–11, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). In *Bose Corporation*, the United States Supreme Court held that the First Amendment requires the appellate court to independently review the evidence to determine whether actual malice is proven with convincing clarity. The Court wrote:

> The requirement of independent appellate review reiterated in *New York Times v.*

*Sullivan* is a rule of federal constitutional law. It emerged from the exigency of deciding concrete cases; it is law in its purest form under our common law heritage. It reflects a deeply held conviction that judges … must exercise such review in order to preserve the precious liberties established and ordained by the Constitution. The question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact. Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of "actual malice."

466 U.S. at 510–11, 104 S.Ct. 1949. This standard has been adopted and applied in Texas. *See Doubleday & Co., Inc. v. Rogers*, 674 S.W.2d 751, 755 (Tex.1984).

Actual malice may be inferred from the relation of the parties, the circumstances attending the publication, the terms of the publication itself, and from the defendant's words or acts before, at, or after the time of the communication.[13] *International & G.N.R. Co. v. Edmundson*, 222 S.W. 181, 184 (Tex. Comm'n App.1920, holding approved); *see also Frank B. Hall & Co. v.*

responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press. In prosecutions for the publication of papers, investigating the conduct of officers, or men in public capacity, or when the matter published is proper for public information, the truth thereof may be given in evidence. And in all indictments for libels, the jury shall have the right to determine the law and the facts, under the direction of the court, as in other cases.

TEX. CONST. art. I, § 8.

12. *See, e.g., Hagler v. Proctor & Gamble Mfg. Co.*, 884 S.W.2d 771, 772 (1994) (holding ill will cannot prove malice); *Channel 4 KGBT*, 759 S.W.2d at 941 (holding a mistake was not actionable where the broadcaster denied subjective awareness of the error); *Doubleday & Co., Inc. v. Rogers*, 674 S.W.2d 751, 755–57 (Tex.1984) (holding that proof a prudent person would not have published or would have first investigated is insufficient); *Foster v. Upchurch*, 624 S.W.2d 564, 566 (Tex.1981) (holding that naming the

wrong person as a killer was a "mistake" and not actual malice); *Dun & Bradstreet, Inc. v. O'Neil*, 456 S.W.2d 896, 900 (Tex.1970) (holding no evidence of actual malice where publisher admitted "I didn't look at it, I'm afraid, as carefully as I should," because of "an executive breathing down my neck"); *El Paso Times, Inc. v. Trexler*, 447 S.W.2d 403, 406 (Tex.1969) (holding the complete failure to investigate amounted to no evidence of constitutional malice).

13. In *Harte–Hanks*, the Court also recognized that "a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence, and it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry." 491 U.S. at 668, 109 S.Ct. 2678 (citations omitted). The Court warned, however, that "courts must be careful not to place too much reliance on such factors." *Id.*

*Buck,* 678 S.W.2d 612, 621 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.) (holding that declarant's knowledge of statement's falsity or serious doubt about its truth can most easily be proved by circumstantial evidence). Mere surmise or suspicion of malice does not carry the probative force necessary to form the basis of a legal inference of malice. *See Procter & Gamble Mfg. Co. v. Hagler,* 880 S.W.2d 123, 127 (Tex.App.—Texarkana), *writ denied per curiam,* 884 S.W.2d 771 (Tex.1994). Circumstantial evidence must be sufficient to permit the conclusion that the defendant entertained serious doubts as to the truth of his publication. *See St. Amant,* 390 U.S. at 731, 88 S.Ct. 1323.

A court of appeals is not a fact finder. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). Accordingly, a court of appeals may not pass upon the witnesses' credibility or substitute its judgment for that of the jury, even if the evidence would clearly support a different result. *See Pool v. Ford Motor Co.,* 715 S.W.2d 629, 634 (Tex.1986). To establish actual malice, it is not enough for the jury to disbelieve the defendant's testimony, however. *See Gonzales v. Hearst Corp.,* 930 S.W.2d 275, 277 (Tex.App.—Houston [14th Dist.] 1996, no writ). In *Harte–Hanks,* the United States Supreme Court examined the role of the jury's credibility determinations in the *de novo* review of actual malice, and stated, "[i]n determining whether the constitutional standard has been satisfied, the reviewing court must consider the factual record in full. Although credibility determinations are reviewed under the clearly-erroneous standard because the trier of fact has had the 'opportunity to observe the demeanor of the witnesses,' the reviewing court must 'examine for [itself] the statements in issue and the circumstances under which they were made to see ... whether they are of a character which the principles of the First Amendment ... protect.'" *Harte–Hanks,* 491 U.S. at 688, 109 S.Ct. 2678 (citations omitted). Thus, while we do not substitute our view of the witnesses' credibility, we must consider all the evidence bearing on the circumstances under which the defamatory statements were made when applying the actual malice test.

## V. Was there Actual Malice?

In their sixth issue, appellants assert the trial court erred in rendering judgment that Turner recover damages from them, and in refusing to render judgment n.o.v. that appellee take nothing from them, because there is no clear and convincing evidence to support the jury's answer to question No. 3, finding the broadcasts were published with actual malice. After our independent review of the entire record, a discussion of evidence bearing on the issue of actual malice follows. Specifically, we examine Turner's attacks on Dolcefino's investigation, Dolcefino's credibility, Dolcefino's use of allegedly known false statements, Dolcefino's alleged recklessness, omission of other facts from the broadcasts, the purported cover-up of the source of the story and the reasons for the failure to include comments from the Hutchinson/McConn press conference in the second broadcast. This examination is made in the context of evidence gleaned from the entire record concerning appellants' subjective belief in the truth of the statements in the broadcasts.

### A. Defendants' Testimony

First, the evidence shows Dolcefino's superiors—his news director, producer, and the station's general manager—expressed their belief in the Turner/Foster story. They did not doubt Dolcefino or the information he reported.

Tom Doerr, the news director for KTRK at the time of the broadcasts, reviewed some of the probate documents, talked to Clyde Wilson, and sat in on Dolcefino's interview with Turner. He testified, when asked if he had any doubt whether he was "getting a straight story" from Dolcefino about the source of the story, that he had "[n]one whatsoever." Dolcefino told Doerr he did not know who delivered the probate documents to the station Wednesday afternoon. When asked whether Dolcefino's "confidential source" was responsible for getting the documents to the station, Doerr replied, "[t]he documents were the documents. You know, who brought those documents by, I don't know." Doerr further testified that, in

his opinion, the broadcast implied Turner was a knowing participant in the insurance scheme, and "[i]n my gut I believed he was a knowing participant. But we were careful to make sure that we reported factually what we knew." Dolcefino brought the first draft of the script by his house Saturday afternoon and they edited it. "Part of my goal in performing that edit was to make sure that what we said was factually true." He acknowledged that at that time they had no direct evidence that Turner was a knowing participant in the scam.

James Masucci, the president and general manager of KTRK at the time of the broadcasts, testified Dolcefino and Doerr called him at home and read the story to him on Sunday afternoon before the broadcasts aired. He acknowledged he was concerned because of the potentially devastating effect on Turner's campaign, but that both assured him the story was "bonafide," true, and could be substantiated. "They had me totally convinced that everything was true they were about to do." He had no knowledge that anything was false. He was concerned that the timing of the story was "lousy," but determined it would be worse to censor the news. He testified, "the people had the right to know." He made the "rather unprecedented" decision on December 2, 1991, to give Turner three minutes of unedited air time before a scheduled debate with Lanier to answer the allegations in the broadcast. Masucci also acknowledged Channel 13 was involved in a serious competition for ratings with the local CBS affiliate, Channel 11.

Richard Longoria, KTRK's executive producer, also testified at trial. He and Tom Doerr assigned the story to Dolcefino. He acknowledged that all those working on the story were concerned about its timing and recognized it could have an effect on the upcoming election. He testified, "[w]e had checked it out. Wayne had worked very hard on it and diligently, [he] is a very, very good reporter. And our question was: Do we withhold this from the public or do we publish it and let the public decide." He stated there was no information in the December 1 broadcast that he believed to be false, and he had no doubts about the truth of the statements in the broadcasts. He stated that after viewing Dolcefino's interview with Turner on Thanksgiving morning, he believed Turner was not revealing all he knew about the Foster matter. He also noted Turner's reactions were strange in that he expressed no shock at learning for the first time that Foster was alive. He also found Thomas' behavior suspicious. He appeared to be untruthful in that "he was protesting too much," and that "definitely something was fishy."

Longoria acknowledged that on Monday following the story, there was "some embarrassment" that Channel 13 failed to air footage from the McConn/Hutchison press conference. He blamed it on a "goof up" by Conway in that she did not inform the producer that the statements were on the tape. He testified Conway told Dolcefino that the important part of the news conference was Turner's allegation that the story had been hand delivered by the Lanier campaign, so that is what Channel 13 aired. The station corrected the mistake and aired the comments on the 6:00 p.m. news on Monday. Longoria asserted it made no difference where the story came from as long as the facts check out, "[a]nd they did and they do."

Dolcefino testified he believed each of the specific complained of statements was true when he broadcast them and he did not know any statement was false. He also did not entertain any doubts, serious or otherwise, as to their truth. Dolcefino's testimony was unequivocal:

Q: All right. As a general proposition— and we'll get into the specifics here in a moment—did you have actual knowledge of the falsity of any fact whether it relates to Mr. Turner or anybody else in your December 1, 1991 broadcast at all, any way, shape or form?

A: No, sir. And I would never put anything on T.V. that I thought was false or even suspected was false.

Q: All right. Did you recklessly disregard the truth, that is did you in fact, entertain serious doubt about the truth of any of the facts that were on the broadcast that was broadcast on Channel 13 on December 1 of 1991?

A: No, Mr. Babcock. And from my standard you could take the word serious out of it because if I have any doubt at all, it doesn't go on T.V. because it's— it ain't no story worth that.

Apart from these assertions, Dolcefino's other testimony was contradicted in several areas, raising an issue of credibility with the jury.[14] According to Turner, it is obvious the jury completely disregarded all of Dolcefino's testimony.

## B. Turner's Contentions

Turner argued at trial that Dolcefino did not simply "doubt the truth" of the story; rather, he knowingly fabricated his central theme and most of the supporting facts. According to Turner, Dolcefino then sought to cover-up his actions through deception and deliberate falsehood. Turner argues that in this effort, Dolcefino displayed reckless disregard for the truth or falsity of the broadcasts.

### 1. Alleged False Statements

Turner contends appellants knowingly broadcast false statements about him and that these knowing falsehoods are evidence of actual malice. Falsity alone does not establish actual malice, however. Even erroneous statements are protected so that our Constitutional freedoms of expression will have the " 'breathing space' that they need . . . to survive." *New York Times,* 376 U.S. at 271–72, 84 S.Ct. 710.

Turner first cites to the statements in the broadcasts alleging Turner "pursued the estate money." Turner asserts Dolcefino knew there was no estate money because the estate had a negative net worth. Turner claims Dolcefino knew that all insurance proceeds were payable to specific named individuals rather than to the Foster estate, and that other attorneys represented those beneficiaries. For example, the court records in Dolcefino's possession before the broadcasts showed Neil Pickett represented Russell Reinders in his effort to collect, and Joseph Horrigan and Carston Johannsen represented Clinton Foster. Turner neglected to mention in his brief, however, that he represented Dwight Thomas, one of the life insurance beneficiaries, in his efforts to collect the insurance proceeds.[15]

We fail to see how the questioned statement about Turner's attempts to collect on the life insurance policies can support actual malice when it is substantially true. On July 22, 1986, Turner sent letters to eight insurance companies notifying them of Foster's "death" and requesting that all insurance claim forms be sent to him.[16] In October 1986, Turner sent the Coast Guard's report, in lieu of a death certificate, to the life insurance companies. Turner testified he was hopeful that "at the appropriate time" the insurers would pay based upon the Coast Guard's report. Union Central Life Insurance Company's Yvonne Lamb testified Turner attempted to cause Union Central to pay $800,000 in insurance proceeds to the Foster estate. AIG Insurance Company's Robert Gamble testified AIG received three letters from Turner demanding payment under AIG's policy. Even after he was disqualified as the estate's attorney, an attorney in Turner's office, Rosemarie Morse, "on behalf of Sylvester Turner," sent insurance claim forms to Carolina Central and to AIG. Turner admitted Morse had his authority to send the claim forms.

---

**14.** Indeed, Dolcefino made personal attacks against Turner's counsel and was referred to by the trial judge, outside the jury's presence, as "the witness from Hell."

**15.** In addition, Dolcefino may have doubted Turner's disclaimers about his involvement in the probate case because Turner denied knowing about the existence of the insurance policies when he drafted Foster's will, yet his deposition showed he had been involved in changing the insurance beneficiaries to the trust created in the will.

**16.** Foster had life insurance policies with Prudential Insurance Company, Union Central Life Insurance Company (three policies), National Western Life Insurance Company, AIG Insurance Company, Carolina Central Insurance Company, Gulf Atlantic Life Insurance Company, and Association Life Insurance Company. In addition, Foster applied for a $1 million policy with GEICO, but the policy was not issued because Foster did not complete the required physical examination before his disappearance.

■ We likewise find no merit in Turner's contention that the statement is false and made with malice because insurance proceeds are non-probate and, therefore, not part of Foster's "estate." Whether the funds were probate or non-probate does not change the import of the statement to the average viewer of the broadcast. Technical errors in legal nomenclature do not cause a statement to be false. *See Seymour v. A.S. Abell Co.,* 557 F.Supp. 951, 956 (D.Md.1983).[17] Moreover, it is undisputed that $800,000 of the Union Central insurance proceeds were payable to the testamentary trust under Foster's will and, therefore, as Foster's probate expert agreed, the funds clearly were part of Foster's probate estate. Thus, even though Turner contends the estate was insolvent, and records showed it was over $300,000 in debt, the $800,000 insurance proceeds payable to the testamentary trust would be part of the probate estate, leaving a substantial positive balance.

■ In addition, the statements in the broadcast also referred to Turner's efforts to get "the millions in insurance money released." Turner contends the broadcasts erroneously referred to $6.2 million in insurance, when there was actually only about $1.7 million in potential benefits payable.[18] Turner conceded that whatever the amount of insurance, "a scam is a scam." Insurance fraud of $1.7 million is no less defamatory than $6.5 million. Discrepancies as to details, such as the amount of money alleged to have been stolen, do not demonstrate falsity for defamation purposes, much less actual malice. *See Downer v. Amalgamated Meatcutters & Butcher Workmen,* 550 S.W.2d 744 (Tex.Civ.App.—Dallas 1977, writ ref'd n.r.e.) (affirming summary judgment where defendant published statement that plaintiff embezzled $2,187.77 instead of $840.73); *Fort Worth Press Co. v. Davis,* 96 S.W.2d 416 (Tex.Civ.App.—Fort Worth 1936, writ ref'd)

(charge that plaintiff wasted $80,000 of taxpayers' money held to be substantially true, even though actual amount was only $17,000).

The evidence at trial, found largely in Turner's own testimony, established that Turner pursued the estate money after "significant evidence of a possible scam had surfaced." For example, Foster signed the will three days before his disappearance. His body was not found, despite an extensive Coast Guard search. Foster, a thirty year old single man, had multiple life insurance policies, most of which were taken out in the months before his disappearance. He had also applied for an emergency passport shortly before his "death." Foster had purchased three cars with credit life insurance before his disappearance. Foster was under indictment in both Houston and Las Vegas, and he was scheduled for trial on June 23, 1986, the day after he disappeared. On June 18, 1986, he promised Agent Bly he would turn himself in the next day, but instead he signed his will in Turner's office and left on the "fatal" boat trip. Turner admitted these facts "raised legitimate questions." He also admitted he continued to advocate in the probate proceeding that Foster was dead, despite these suspicious circumstances.

■ Turner also cites to other examples where certain statements in the broadcast were not literally true in every respect, and he contends Dolcefino admitted at trial that he knew of these mistakes before the broadcasts. First, Turner attacks the statements concerning the drawing and executing of Foster's will. "And in June of that year [1986], Turner drew up a will for Foster; the timing interesting." The date is correct. Turner testified, "we started working on it in May, completed it in June." The statement, "the timing interesting," is clearly opinion, rather than an assertion of fact; it is thus protected by our state constitution. *See*

---

17. For the same reason, Dolcefino's incorrect reference to Thomas as the "administrator" of the estate, rather than its executor, is no evidence of actual malice. The average person would discern no difference between the terms. Even Turner referred to Thomas as the "administrator," both in his interview with Dolcefino and at his 8:00 p.m. press conference.

18. In addition to the approximately $1.7 million in life insurance policies, there was the $1 million GEICO policy that was not issued and numerous credit life insurance policies on various vehicles.

*Carr v. Brasher,* 776 S.W.2d 567, 570 (Tex. 1989).[19]

Turner takes issue with the following statements: "On June 19th, Foster rushed to sign the will in Turner's office. June 22nd, nine days after the indictment, three days after drawing up the will, Foster supposedly falls off the boat in another boat's wake and drowns." It is not disputed that Foster signed his will on June 19th, and the statement that he "rushed" to do so is not defamatory of Turner. In any event, it is a fair characterization. Foster had promised Agent Bly that he would turn himself in, and was facing trial. He spent the night of June 18 at the home of Jon Nelson, who testified Foster was very upset, panicked about the prospect of prison, and was "desperate" on the morning of June 19th. The second statement also is not actionable by Turner because it is not "of and concerning" him. *See Holly v. Cannady,* 669 S.W.2d 381, 383 (Tex. App.—Dallas 1984, no writ). It appears to refer to the action by Foster in "drawing up his will" before the boating accident. The depositions taken in the probate proceeding, at which Turner was present, contained numerous references to June 19th as the date the will was "drawn up." Turner did not object to this characterization. Accordingly, Dolcefino would have no reason to doubt that the will was drawn up on June 19th, three days before Foster's disappearance, as he reported. In addition, an expert witness, former probate Judge Ashmore, testified the words "signing" and "drawing up" can by used synonymously when referring to the execution of a will.

Next, Turner complains the following statement was known to Dolcefino to be false when he made it: "Turner also tried to block the questioning of a female friend of Foster's in this case, Christina Batura, a woman promised a share of money in the will." At trial, Dolcefino first testified this statement referred to Turner's reluctance to produce Batura for her deposition. He then admitted Turner had not blocked the deposition, but asserted Turner had impeded the Secret Service's efforts to question Batura. Even if we disregard Dolcefino's self-contradictory testi-

mony, as the jury must have done, there is other evidence in the record to support a belief that Turner may have attempted to impede Batura's questioning.

Agent Bly testified Turner blocked Batura's questioning by telling the Secret Service she did not want to take a polygraph or that Turner would advise her not to take it. Colwell confirmed Turner blocked the questioning of Batura by refusing to cooperate with Bly's attempts to interview her. Turner knew Batura had moved to Seattle in 1987, but he did not tell Bly where she was when Bly attempted to find her. Turner also filed answers to interrogatories in the probate case listing Batura's address as Houston when he knew she was living in Seattle, and he knew the Secret Service wanted to have her take a polygraph test. Secret Service Agent Walsh opined that the failure of an attorney to inform the Secret Service of Batura's location would be "blocking" the questioning of a witness.

Turner asserts the statement in the broadcasts that the probate judge "removed him from the case over Turner's protests, citing conflicts of interest" is also false and was known to be false when made. Docefino admitted the order signed by Judge Hutchison did not "cite conflicts of interest." Turner's probate expert, Judy Lenox, testified it was "false" that the probate judge cited conflicts of interest. Her testimony, however, is contradicted by the undisputed documents. The Motion to Disqualify Counsel, which was granted, sought Turner's removal because he would be needed to testify as a fact witness. Thus, the grounds for the motion were that there was a conflict of interest between serving as an attorney and testifying as a witness. Furthermore, even if Dolcefino made a technical error in interpreting the withdrawal order, such an error does not constitute a knowing falsity. *See Gonzales,* 930 S.W.2d at 277 (holding that "a mistake or error in judgment is not enough" for actual malice).

Finally, Turner contends actual malice is shown by the falsity of Dolcefino's statement questioning whether Turner had been "duped

---

**19.** As noted earlier, the Texas Constitution specif- ically protects opinion. *See* n. 11, *supra.*

by overwhelming evidence and at least two legal clients with close ties to one of his closest friends." Thomas was the "close friend," and the two purported clients were Foster and Batura. Turner argued the statement is not accurate because it "indicates that there are two legal clients. I only represented one." Turner asserts Dolcefino admitted he knew before December 1, 1991, that Turner did not represent Christina Batura. Appellants, on the other hand, assert the statement is substantially true. There is evidence that Dolcefino had ample reason to believe Turner represented Batura when Dolcefino made the questioned statement. First, Jay Bly told Dolcefino that Turner represented Batura. Liz Colwell also testified that the statement was true. During her probate deposition, Batura acknowledged she spent several hours going over the Foster matter with Turner before her deposition. She also testified in her deposition that Turner was "acting as my attorney today." After a conference conducted off the record, however, she testified that even though Turner had coordinated her coming to the deposition, there was no attorney-client relationship between them.[20] Other evidence also indicated Turner acted on Batura's behalf. For example, Turner appeared at a sequestration action to oppose sequestration of Foster's hair salon equipment in Batura's possession. Jeff Kaiser, an attorney for First City Bank, testified Batura referred him to Turner in his efforts to sequester the equipment. In the sequestration proceeding, Turner represented to the court that Foster had "plenty of life insurance," and the court denied the sequestration, leaving the property in Batura's possession.

Moreover, Turner acknowledged at trial that it would be accurate to say he was duped by one legal client rather than two. Thus, the statement is substantially true and not actionable. A variance such as the number of clients who acted to mislead Turner may be disregarded. Being duped by two legal clients is certainly no more damaging to one's reputation in the mind of the average listener than the "truth," that Turner was

duped by one client. *See McIlvain*, 794 S.W.2d at 14, 15. Because the statement is substantially true, it cannot form the basis for a finding of actual malice. Furthermore, even if Dolcefino acknowledged that Batura was not Turner's "client" in the strict legal sense, to the average person, it would appear that he acted on her behalf.

In conclusion, we find no clear and convincing evidence that appellants knowingly broadcast false statements about Turner.

### 2. Reckless Disregard

Turner also asserts Dolcefino acted with reckless disregard for the truth or falsity of the statements in the broadcasts. To support a finding of actual malice, Turner had the burden to provide clear and convincing evidence that Dolcefino not only demonstrated a reckless disregard for the truth or falsity of the statements in the broadcasts, but also that he "in fact entertained serious doubts as to the truth of his publications." *St. Amant*, 390 U.S. at 731, 88 S.Ct. 1323. The Supreme Court has recognized that this standard may result in cases of harm to reputation that cannot be redressed:

> Concededly the reckless disregard standard may permit recovery in fewer situations than would a rule that publishers must satisfy the standard of the reasonable man or the prudent publisher. But *New York Times* and succeeding cases have emphasized that the stake of the people in public business and the conduct of public officials is so great that neither the defense of truth nor the standard of ordinary care would protect against self-censorship and thus adequately implement First Amendment policies.

*Id.* at 731–32, 88 S.Ct. 1323.

### a. Dolcefino's Investigation

██ Turner challenges the thoroughness of Dolcefino's investigation. Indeed, Turner repeatedly asserts in his brief that Dolcefino was personally aware that his central premise was false. It is well settled that failure to

---

**20.** Judy Lenox, Turner's probate expert acknowledged that it would have been inappropriate for Turner to represent Batura, one of the beneficiaries of Foster's will, while he represented Thomas as the executor.

investigate amounts to negligence and does not establish actual malice. *See St. Amant,* 390 U.S. at 731, 733, 88 S.Ct. 1323. Because the actual malice standard is a subjective one, the Court in *Harte–Hanks* wrote that the evidence must be sufficient to permit the conclusion that the defendant actually had a "high degree of awareness of ... probable falsity." 491 U.S. at 688, 109 S.Ct. 2678. As a result, the failure to investigate before reporting allegations, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard. *See id.* The evidence in the record reveals, however, that Dolcefino investigated the case. That Dolcefino believed in the truth of the published statements is demonstrated by corroborating evidence he uncovered during the investigation.

Dolcefino testified he spent twelve to fifteen hours a day from Wednesday morning, November 27, 1991, until Sunday, December 1, 1991, investigating the story. Over those four days, he interviewed over thirty people and reviewed approximately 500 pages of probate court records. Many of the details of Dolcefino's investigation have been recited in the previous discussion of the facts and need not be repeated here. For each complained of statement in the broadcast, Dolcefino asserted he had either a documentary source, a human source, or both. He confirmed every one of the complained of statements with Elizabeth Colwell, the court-appointed investigator.[21]

▆ Based on our review of the entire record, we hold that such evidence is sufficiently probative to negate a jury finding of actual malice. It is our duty, "as expositors of the Constitution, ... [to] independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof

of 'actual malice.' " *See Harte–Hanks,* 491 U.S. at 686, 109 S.Ct. 2678 (*quoting Bose Corp.,* 466 U.S. at 511, 104 S.Ct. 1949).

### b. Deliberate Avoidance of Contradictory Facts

The United States Supreme Court wrote in *Harte–Hanks* that "[a]lthough failure to investigate will not alone support a finding of actual malice, the purposeful avoidance of the truth is in a different category." 491 U.S. at 692, 109 S.Ct. 2678 (citation omitted). Turner cites, as further evidence of Dolcefino's reckless disregard, facts Dolcefino omitted from the broadcasts. For example, Dolcefino did not include in his story the fact that the Coast Guard had concluded Foster was "lost at sea." He also failed to mention Turner had been disqualified from the probate case for three years before the judge finally declared Foster dead. Turner relies heavily on appellants' efforts to conceal the source of the story as evidence of deliberate avoidance of the truth. Turner characterizes the failure to include the statements made by Hutchison and McConn at the press conference as Dolcefino's decision to avoid the truth which constitutes evidence of Dolcefino's recklessness.

### (1) The Cover–Up

Turner made much of the fact the evidence indicated Dolcefino purposely excluded the comments of Hutchison and McConn in the 10:00 p.m. broadcast, and then blamed the exclusion on another reporter's "goof up." Much of the evidence cited to support actual malice includes the actions of KTRK and Dolcefino *after* the broadcasts. The emphasis at trial was on the effort to conceal the source of the story and that there were political motivations behind it. Both the omission of the press conference and the source of the story are part of what Turner refers to as Channel 13's "cover-up."

---

**21.** Turner criticizes Dolcefino's sources because they did not directly link Turner to the insurance scam. Dolcefino's primary sources for the statements in the broadcasts, apart from the probate documents, were Bill Elliott and Liz Colwell. Elliott had been hired by Turner's wife, Cheryl, in connection with the couple's marital problems. Elliott also had employed Colwell when she investigated Foster's disappearance. Although he knew of no evidence linking Turner to the Foster scheme, he believed Turner was involved. Turner criticizes Dolcefino's reliance on Colwell's confirmation because he only spoke to Colwell twice on the phone. The first call lasted five to ten minutes, and the second call was "very short, very minor." Colwell also acknowledged she had no proof, but had a "feeling" that Turner was involved.

## (i) The Story's Source

 Much of the testimony at trial concerned the source for the story. Dolcefino attempted to conceal that one of the sources of his information was connected to the Lanier campaign. Peary Perry did not recall furnishing any information to Dolcefino. Clyde Wilson testified that he initiated the story. Wilson could not recall who at the Turner camp had given him the tip. He eventually gave the name of Edwin Lewis, who later testified and denied any knowledge of the information or that he had worked on the Turner campaign. Shara Fryer confirmed Wilson called her at home Tuesday evening with the tip, which she forwarded to Dolcefino. Wilson did not recall giving Fryer Peary Perry's name, but acknowledged that if she said he did, he must have. Fryer confirmed Wilson gave her both Perry's name and the name of Bill Elliott as persons who could be contacted for additional information.

 Turner incorrectly argues that Dolcefino lied when he denied Perry was "his initial source." The testimony confirms that Clyde Wilson was the original source. Even assuming Peary Perry was the "initial" source for the broadcasts and was motivated by a strong political bias against Turner, that amounts to no evidence of actual malice, let alone clear and convincing evidence. Political motivation does not equate with knowing or reckless falsity. Indeed, "a newspaper's motive in publishing a story—whether to promote an opponent's candidacy or to increase its circulation—cannot provide a sufficient basis for finding actual malice." *Harte–Hanks*, 491 U.S. at 665, 109 S.Ct. 2678; *see also Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 715 (4th Cir.1991) ("Actual malice cannot be proven simply because a source of information might also have provided the information to further the source's self-interest."). In addition, Dolcefino's review of over 500 pages of probate records cannot be dismissed simply because these documents may have been furnished by Peary Perry. It is undisputed that these documents were authentic public records.[22] We conclude appellants' efforts to conceal the source of the story, although deceptive and probably inflammatory to the jury, do not constitute clear and convincing evidence that Dolcefino entertained serious doubts as to the truth of the broadcasts.

## (ii) The Hutchison/McConn Press Conference

 Turner contends that evidence that Dolcefino personally chose not to broadcast the statements by McConn and Hutchinson during the 10:00 p.m. broadcast "was probably the most compelling evidence of his recklessness offered at trial." He relies on the testimony of Mary Ellen Conway to the effect that Dolcefino was "well aware" of the Hutchison and McConn statements, and that Dolcefino omitted their comments because the two men never returned his telephone calls. Even if we assume this testimony is true, the omission of the Hutchison and McConn statements cannot as a matter of law support a finding of actual malice.

Mary Ellen Conway testified Doerr told her to cover Turner's news conference and get a thirty-second sound bite with Turner's reaction to the 5:30 p.m. broadcast. She took a camerawoman with her and took copious notes. She returned to the station between 9:00 and 9:15. She conceded she did not exactly debrief Dolcefino because she was pressed for time, but she left her notes and videotape with him. Conway showed her notes to Faith Dalusio, the segment's producer, and while she was speaking with Dalusio, Dolcefino walked up to them. She testified she did not go over her notes with Dalusio or Rebecca Nieto, the news producer. Conway later asserted she was sure she told Dolcefino about the Hutchison and McConn statements at the press conference. Conway testified that when she heard Turner blame the story on the Lanier campaign, she wanted to hurry to get a comment from the Lanier camp. After leaving her press conference notes with Dolcefino, Conway left immediate-

---

**22.** Turner acknowledged at trial and before this court that Dolcefino received the probate documents on Wednesday afternoon, November 27, 1991. About twenty pages of these records bear a file stamp date of December 16, 1991, but the record indicates that these are certified copies of the same records reviewed before the broadcast on December 1.

ly for Lanier headquarters, obtained a statement from Craig Varoga, Lanier's campaign manager, and rushed back to the station, arriving just before the beginning of the 10:00 p.m. news. Conway testified she had no involvement in writing the script for any part of the story that aired at 10 p.m. She testified she did exactly what she was supposed to do and denied she had "goofed up."

■■■■ Even if we take Conway's testimony as true, as the jury must have done, Dolcefino's omission of the statements, even if deliberate, does not support the conclusion that Dolcefino entertained serious doubts as to the truth of his broadcasts. Moreover, in assessing actual malice, it is the publisher's state of mind "at the time of publication" that is determinative. *Bose*, 466 U.S. at 498, 104 S.Ct. 1949. Therefore, the Hutchison and McConn statements, made at a press conference at 8:00 p.m., cannot support a finding of actual malice with respect to the 5:30 p.m. broadcast. They likewise do not provide clear and convincing evidence of actual malice as to the 10:00 p.m. broadcast. The Hutchison and McConn comments did not refute any specific statements in the broadcasts and, in particular, they did not refute any statements that Turner claims are libelous. Neither Hutchison nor McConn saw the 5:30 p.m. broadcast, and they did not offer any facts to refute the specific challenged statements in the broadcast. *See Howell v. Hecht*, 821 S.W.2d 627, 631 (Tex. App.—Dallas 1991, writ denied) (holding there was no evidence of actual malice when a story was republished after the plaintiff denied the story but failed to "state with specificity any facts" which would inform the defendant that the statements made were false). McConn stated he was "here as a lawyer tonight, at Mr. Turner's request, to explain my perceptions of the case." He stated Turner's conduct in the probate case "was not other than professional," although he prefaced his remark by saying, "[t]he

issue that I was handling was whether Mr. Foster was dead or not and I was not focusing on Mr. Turner's conduct." McConn also stated he did not believe Turner did anything dishonest or inappropriate "or had anything to do with any scheme that Mr. Foster might have cooked up."[23] McConn did not testify at trial.

Judge Hutchison also stated at the press conference that Turner's conduct in his court had been "very professional" and declared "this is a fairly ridiculous allegation" against Turner. He acknowledged at trial, however, that when he made these statements, he had not seen the 5:30 p.m. broadcast and knew only what he had been told by Turner concerning its contents.

There is no evidence the statements in the press conference caused Dolcefino to entertain serious doubts about the truth of the complained of statements. Therefore, the omission of the McConn and Hutchison statements is not evidence of actual malice. *See Brown v. Herald Co.*, 698 F.2d 949, 951 (8th Cir.1983) (holding that favorable information about plaintiff, reviewed by defendant, but omitted from a broadcast does "not reach the level of malice required by *New York Times*"). Even if the comments of Hutchison and McConn had directly challenged the truth of any of the alleged defamatory statements in the broadcasts, they would be legally insufficient to constitute evidence of actual malice. *Id.; Speer v. Ottaway Newspapers, Inc.*, 828 F.2d 475 (8th Cir.1987) (disregarding source who claimed other source's version was a "pack of lies" is not actual malice). As the Fifth Circuit has observed:

> While verification of the facts remains an important reporting standard, a reporter, without a "high degree of awareness of their probable falsity," may rely on statements made by a single source even though they reflect only one side of the story without fear of libel prosecution by a public official.

---

**23.** Dolcefino had seen documents in the probate files showing McConn attempted to take Turner's deposition in the probate case, citing the "crime/fraud" exception to the attorney client privilege as one of the reasons such testimony was permissible. *See* Tex.R. Evid. 503(d)(1). McConn argued to the court, "any conversation between

Foster and his attorneys regarding his intent to stage his disappearance would not be privileged. Conversations relating to the commission of a future crime are not covered by the attorney/client privilege." McConn did not go so far as to accuse Turner of wrongdoing, however.

*New York Times Co. v. Connor*, 365 F.2d 567, 576 (5th Cir.1966); *see also Times–Mirror Co. v. Harden*, 628 S.W.2d 859, 865 (Tex. App.—Eastland 1982, writ ref'd n.r.e.).

The emphasis on the alleged "cover-up" is misplaced. Dolcefino was free to rely on and to believe his original sources. *See Speer*, 828 F.2d at 478 ("A publisher's failure accurately to guess which of two conflicting accounts a jury might later believe does not demonstrate actual malice."). The United States Supreme Court has rejected the inference of actual malice where a witness, although his testimony was not credible, "refused to admit [his mistake] and steadfastly attempted to maintain that no mistake had been made—that the inaccurate was accurate." *Bose*, 466 U.S. at 512, 104 S.Ct. 1949. This evidence more appropriately addresses the issue of common law malice, which is quite distinct from actual malice required to support a libel action. "The phrase 'actual malice' is unfortunately confusing in that it has nothing to do with bad motive or ill will." *Harte–Hanks*, 491 U.S. at 666 n. 7, 109 S.Ct. 2678 (citing *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 52, n. 18, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) (Brennan, J.)).

## C. The Role of Editorial Control and Judgment

 The exercise of editorial judgment to omit information favorable to the plaintiff is no evidence of actual malice. *See, e.g., Peter Scalamandre & Sons, Inc. v. Kaufman*, 113 F.3d 556, 563 (5th Cir.1997) ("TV Nation was entitled to edit the tape it shot to fit into the short time frame allotted to the sludge segment"). A publication may portray a person in a negative manner without liability because there is no legal obligation to present a "balanced view." *Perk v. Reader's Digest Ass'n, Inc.*, 931 F.2d 408, 412 (6th Cir.1991).

In *Miami Herald Publishing Co. v. Tornillo*, the newspaper published a political attack on the plaintiff. 418 U.S. 241, 243, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974). The United States Supreme Court held the plaintiff had no right to use a state law to require the paper to publish a reply, and that a statute requiring the publisher to provide balanced coverage was unconstitutional. *See id.* at 258, 94 S.Ct. 2831. Under the statute, "political and electoral coverage would be blunted or reduced." *Id.* at 257, 94 S.Ct. 2831. The Court noted "there is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs. This of course includes discussion of candidates...." *Id.* (citing *Mills v. Alabama*, 384 U.S. 214, 218, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966)). The Court also recognized that "[a] responsible press is an undoubtedly desirable goal, but press responsibility is not mandated by the Constitution and like many other virtues it cannot be legislated." *Id.*

The *New York Times* rule creates a "constitutional zone of protection" for errors of fact caused by negligence, recognizing that factual errors may occur in reporting without imposing liability on a media defendant. *See Time, Inc. v. Pape*, 401 U.S. 279, 291, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971). In *New York Times*, the United States Supreme Court wrote:

A rule compelling the critic of official conduct to guarantee the truth of all his factual assertions—and to do so on pain of libel judgments virtually unlimited in amount—leads to ... 'self -censorship.' Allowance of the defense of truth, with the burden of proving it on the defendant, does not mean that only false speech will be deterred. Even courts accepting this defense as an adequate safeguard have recognized the difficulties of adducing legal proofs that the alleged libel was true in all its factual particulars.... Under such a rule, would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so.

376 U.S. at 279, 84 S.Ct. 710. A media defendant who "maintains a standard of care such as to avoid knowing falsehood or reckless disregard of the truth is thereby given assurance that those errors that nonetheless occur will not lay him open to an indeterminable financial liability." *Pape*, 401 U.S. at 291, 91 S.Ct. 633.

Courts recognize the media is not required to include additional facts in its coverage that may cast a public figure in a more favorable light. *See Tornillo*, 418 U.S. at 258, 94 S.Ct. 2831 ("[T]he choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair—constitutes the exercise of an editorial control and judgment."); *Machleder v. Diaz*, 801 F.2d 46, 53 (2d Cir.1986) ("[A] rule that would hold a media defendant liable for broadcasting truthful statements and action because it failed to include additional facts that might have cast the plaintiff in a more favorable or balanced light ... violates the First Amendment."); *see also A.H. Belo Corp. v. Rayzor*, 644 S.W.2d 71, 85 (Tex. App.—Fort Worth 1982, writ ref'd n.r.e.) (holding there was no actual malice as a matter of law where reporter interviewed several sources, one of whom was plaintiff who provided a conflicting version of events).

We conclude that actual malice has not been shown by appellants' failure to include other facts in their report that may have cast Turner in a more positive light. Nor does the evidence concerning Dolcefino's investigation or the alleged cover-up rise to the level of clear and convincing evidence of reckless disregard for the truth of the statements in the broadcasts.

## D. Comparison with *Harte–Hanks*

Turner contends *Harte–Hanks* is controlling and asserts he "mirrored" his case after the United States Supreme Court's decision. We find significant differences between *Harte–Hanks* and this case, however.

This case does not present the same indicia of actual malice as were present in *Harte–Hanks*. First of all, it is important to note that the newspaper in *Harte–Hanks* relied on a single source, Alice Thompson, who charged that Connaughton, a candidate for judicial office, had used "dirty tricks," offered bribes, and suborned perjury. *See Connaughton v. Harte Hanks Communications, Inc.*, 842 F.2d 825, 832 (6th Cir.1988). The newspaper knew Thompson was disgruntled and vindictive, had a criminal background,

had undergone "psychiatric treatment for emotional instability and mental problems," had refused a polygraph examination, and she had reported her charges to the local police who had refused to take action. *Id.* at 831–32. The story had been denied not only by Connaughton, but also by five other witnesses before it was published. The most serious charge made by Thompson was not only highly improbable, but also inconsistent with other facts well known to the defendants, including a taped interview with Connaughton in which he unambiguously denied each allegation of wrongful conduct. The defendants did not listen to an important taped interview with a key witness, nor did they attempt to interview her. In cases involving allegations made by third parties, "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." 491 U.S. at 688, 109 S.Ct. 2678. In upholding the jury's finding of actual malice, the Court in *Harte–Hanks* relied on the newspaper's failure to interview the key witness or listen to the tape recorded interview, even though there was reason to doubt the informant's veracity, to find sufficient evidence of an intent to avoid the truth to satisfy the *New York Times* standard. *Id.* at 692–93, 109 S.Ct. 2678. The Court found it likely that the defendant's inaction was a product of "a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of [the] charges." *Id.* at 692, 109 S.Ct. 2678.

In this case, in contrast to specific charges of wrongdoing as in *Harte–Hanks*, the broadcasts did not accuse Turner of being directly involved in the life insurance scam. Instead, the story raised questions about the suspicious circumstances of Foster's "death" and how much Turner knew, as well as questioning Turner's choice of business and personal associates.

Also in contrast to *Harte–Hanks*, Dolcefino investigated the story before running it, and he did not avoid certain witnesses. Dolcefino did not avoid Turner; he interviewed him extensively, and he repeatedly asked Turner's press secretary for denials and contradictory evidence. In his interview the Friday before the broadcast, Dolcefino stat-

ed, "I want to give you the opportunity to deny in the strongest terms as you want to the suggestions that were made that either you knew about it beforehand or you found out about it later, yet you still pursued it because you were trying to help your friend Thomas get ahold of a six million dollar estate. I'm not accusing you of it, I want to give you the opportunity to respond to it in any way you want to." Turner replied, "[t]hat's not even funny. Anybody that knows me knows that's not in my nature." [24] His concluding remarks to Dolcefino were included in the broadcast: "if the fact is the man is alive the man ought to be dealt with and anyone else who participated in this whole charade should be dealt with in the strictest and severest of terms." Dolcefino repeatedly requested factual information to refute the statements in the story and was given none. Instead, Turner's own press secretary testified Turner merely "laughed" when asked for responsive documents, because there was "nothing to give."

Even if we assume Dolcefino knew Perry worked for the Lanier campaign, and thus, had a political motivation to spread negative publicity about Turner, Dolcefino did not rely solely on Perry. Far from it—he interviewed numerous parties and reviewed hundreds of pages of documentary evidence before he reported the story. These probate court records, which included Turner's deposition, provided Dolcefino with a "complete picture" of the probate proceedings, according to appellants' probate expert. One of Dolcefino's primary sources, Colwell, investigated the matter for almost two years. The fact that Colwell's conversations with Dolcefino may have been brief does not refute her testimony that she confirmed the truth of each statement in the broadcasts.[25]

In *Harte–Hanks,* the charges were highly improbable. Here, in contrast, there had been several items in the news that would tend to raise questions about Turner's qualifications and ability to serve as Houston's mayor. As the runoff election approached, Turner began to attract greater scrutiny by the press. Articles in the Houston newspapers reported a suit against Turner for insurance fraud, in which it was alleged that Turner, while acting as an attorney, "misrepresented a client's fire insurance claim." The case was scheduled to go to trial shortly after the runoff election.[26] Newspapers also reported that Turner had failed to repay student loans to Harvard Law School and the University of Houston, and that Harvard had obtained a default judgment against him for $8,439.77. Turner also had a history of many other delinquent bills, including the failure to pay State Bar dues, causing his membership to lapse. The *Houston Post* reported a bad check charge, and stated that Turner "disregarded notices that a criminal charge had been filed against him causing a warrant to be issued for his arrest."

All of these questionable charges against Turner, together with the lack of credibility shown by both Turner and Thomas in their interviews with Dolcefino, would have supported Dolcefino's belief in the validity of the Foster scheme allegations rather than to doubt their truth. In addition, Dolcefino based his story on reliable information from trustworthy sources, which were primarily the court records, a Secret Service agent, and the official probate court investigator. This court has rejected a claim of fabrication on far less evidence to support the accuracy of the report. *See Gonzales,* 930 S.W.2d at 282 (holding it is unreasonable to infer a

---

**24.** In both *Harte–Hanks* and *Curtis Publishing Co. v. Butts,* the defendants had statements from the plaintiffs prior to publication that the account to be published was untrue. *See* 491 U.S. at 691–93 n. 39, 109 S.Ct. 2678 (citing Chief Justice Warren's concurring opinion in *Butts,* 388 U.S. 130, 169–70, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967)). Turner's response did not import to Dolcefino any knowledge of the falsity of the proposed publication.

**25.** Turner asserts the jury rejected Colwell's testimony, and therefore, this court must also disregard it. We disagree. The testimony may be

considered with reference to Dolcefino's subjective belief in the truth of his story. He received confirmation from a knowledgeable source, and there is no evidence that he had reason to doubt this confirmation.

**26.** Turner failed to appear for a scheduled hearing, and the trial court granted a partial summary judgment holding Turner liable for misrepresentation to an insurance company and awarding nearly $50,000 in damages on December 2, 1991. The case was later settled for $13,500.

reporter had willfully published false information when there was a dispute about whether the source in fact provided the information).

## VI. Conclusion

Even if we disregard Dolcefino's testimony concerning his belief in the truth of the statements in the broadcasts, as the jury must have done, we find no clear and convincing evidence to support a finding that he did not in fact believe the statements were true or that he entertained serious doubts about the truth of the statements. In short, there is no evidence of an intent to avoid the truth. *See Harte–Hanks*, 491 U.S. at 692, 109 S.Ct. 2678. We hold the record does not contain clear and convincing evidence to support the jury's finding of actual malice, as alleged in appellants' sixth issue.

In the absence of actual malice, the judgment cannot stand, and we need not address appellants' remaining issues. We reverse the judgment of the trial court and render judgment that Turner take nothing.

## APPENDIX

### CHANNEL 13 NEWS BROADCAST

*5:30 P.M. NEWS—December 1, 1991*

BOB BOUDREAUX:

Good evening everyone, and thank you for joining us.

We begin tonight with word of what may be one of the biggest attempted insurance swindles in recent Houston history, the apparent conspiracy to fake the death of a 30–year old Houston man with criminal troubles and millions of dollars in life insurance.

Tonight, Wayne Dolcefino with his 13 exclusive undercover investigation into a mystery with potential explosive political twist.

Wayne.

WAYNE DOLCEFINO:

That's right, Bob, because among the questions: What role did Houston mayoral candidate, Sylvester Turner, play in this tale of multi-million dollar fraud?

We have been investigating Turner's role in this attempted insurance swindle since we first heard about it on the day before the Thanksgiving holiday.

Our focus, what did Sylvester Turner know and when did he know it?

In loving memory, the obituary read.

It was June of 1986, and 30–year old Sylvester Clyde Foster, a male model and beauty salon owner, had died in a freak accident.

Two companions claimed Foster had fallen off a sail boat and into the waters of the Gulf of Mexico six miles south of Galveston.

The Coast Guard searched but the body was never found.

This week, 13 Undercover learned Sylvester Foster was very much alive and in prison in Salamanca, Spain, under an alias, Christopher Lauren Fostier.

Fostier had been arrested after allegedly delivering two kilos of cocaine to a Spanish undercover agent.

Dwight Thomas was said to be Foster's closest friend here in Houston.

We asked him on Thanksgiving morning about Foster's miraculous return from the grave.

DWIGHT THOMAS:

Prison, Spain?

SPEAKER:

Uh-huh.

DWIGHT THOMAS:

Prison, Spain?

Prison, Spain?

SPEAKER:

Sylvester Clyde Foster.

DWIGHT THOMAS:

I know who you're speaking of.

SPEAKER:

Yeah.

DWIGHT THOMAS:

I know nothing about prison in Spain.

SPEAKER:

You don't know that he's alive and he's in prison?

DWIGHT THOMAS:

No.

WAYNE DOLCEFINO:

We found Thomas at his home in Inwood Forest, a home he shares with mayoral candidate Sylvester Turner.

It's the home Turner has been leasing inside the city limits since he announced plans to run for mayor.

The candidate claims the news about Foster was news to him, too.

SYLVESTER TURNER:

That guy died more than five or six years ago.

SPEAKER

He's not dead.

SYLVESTER TURNER:

As far as we all know.

I mean, he went overboard.

SPEAKER:

He's in Spain.

SYLVESTER TURNER:

Not as far as I know.

WAYNE DOLCEFINO:

Both Dwight Thomas and Sylvester Turner were deeply involved in the Sylvester Foster case and the attempt to get life insurance companies to pay off 6.5 million dollars in the wake of the disappearance.

But did they know it was all a hoax, a scheme to swindle millions?

DWIGHT THOMAS:

No.

I wouldn't set myself up for something crazy like that.

SPEAKER:

And Sylvester Turner didn't know?

DWIGHT THOMAS:

No.

No.

We never would have—in fact, as a mater of fact, we wouldn't have dealt with him at all if we had known that he was doing something out of the ordinary beyond the premise of the law.

WAYNE DOLCEFINO:

But Thomas and Turner did deal with Sylvester Foster, even after learning he was the target of criminal investigations in early 1986, and they pursued the estate money even after significant evidence of a possible scam in Foster's death had already surfaced.

Dwight Thomas introduced Foster to his friend, attorney Sylvester Turner in early 1986.

And in June of that year, Turner drew up a will for Foster; the timing interesting.

On June 13th, Sylvester Foster was indicted by a Houston federal grand jury for massive credit card fraud.

On June 19th, Foster rushed to sign the will in Turner's office, leaving the next day for a sail boat trip in the Gulf, despite what friends called his fear of the water.

June 22nd, nine days after the indictment, three days after drawing up the will, Foster supposedly falls off the boat in another boat's wake and drowns.

Curious?

Get this: In the weeks before the bizarre accident, Foster had applied for an emergency passport, bought several luxury cars with life insurance policies attached, and amassed millions in life insurance coverage.

Despite the signs of something fishy, Sylvester Turner began the legal effort to get the millions in insurance money released and get mutual friend, Dwight Thomas, appointed as administrator over the estate.

Thomas at first denied he sought control of Foster's estate until we told him about court documents we had viewed.

DWIGHT THOMAS:

The deal of it was, after he passed away, I found out that I was administrator of the estate.

So—

WAYNE DOLCEFINO:

In fact, Thomas petitioned the court to become administrator.

We then asked him why the evidence didn't make him suspicious.

DWIGHT THOMAS:

We looked into that.

I didn't really know—actually, I really didn't want to get too deeply involved in it because I didn't know what was going on.

SYLVESTER TURNER:

There have been times we made out a will for individuals and they die for various reasons shortly thereafter.

And you look at it and you say, well—you know, try and put together the circumstances by which it come about.

I mean, it does happen.

WAYNE DOLCEFINO:

Turner also tried to block questioning of a female friend of Foster's in this case, Christina Batura, a woman promised a share of the money in the will.

Batura died two years ago in an Hawaiian commuter plane crash, and Secret Service investigators now confirm they found letters and pictures that proved Batura knew Foster was alive, as she tried to collect on his death, and Turner helped her.

And investigators say they have statements that Turner's close friend, Dwight Thomas, threatened at least one witness who had told authorities Foster was alive.

Thomas denies he was part of any scam.

DWIGHT THOMAS:

No.

No.

No.

No.

No.

Undoubtedly no.

WAYNE DOLCEFINO:

Sylvester Turner pursued the estate case for a year, until a judge removed him from the case over Turner's protest, citing conflicts of interest.

In November of 1987, Turner tried to collect more than $28,000 in legal fees from the still unsettled estate for his work.

The bill was rejected.

Thomas never gained control of the estate.

And only one of nine insurance companies ever paid off any money in Foster's death.

And that money went to his father.

The mayoral candidate questions the timing of the revelations and claims he, too, was a victim, not part of any conspiracy to conceal Foster's European get-away.

SYLVESTER TURNER:

Sylvester Turner is the one that's been left with the bill.

WAYNE DOLCEFINO:

But if that's true, then Sylvester Turner was duped by overwhelming evidence and at least two legal clients with close ties to one of his closest friends.

SYLVESTER TURNER:

You told me the man is a liar.

The man ought to come back here and be dealt with, if that's the case.

If, in fact, he is, then he ought to be dealt with in the severest of terms.

WAYNE DOLCEFINO:

Do you feel used by him?

SYLVESTER TURNER:

Yeah.

WAYNE DOLCEFINO:

Sylvester Turner claims he fully cooperated with all of the investigations into Foster's disappearance, but at least three investigators very close to this case tell us that's simply not true.

And Bob, we'll continue to pursue the full story both here at home and in Spain.

BOB BOUDREAUX:

Is Foster coming back?

WAYNE DOLCEFINO:

The United States government is trying to extradite him back to Sprain, and we have been trying through the U.S. embassy in Madrid to get contact with him.

BOB BOUDREAUX:

Thank you very much, Wayne. Keep following that one.

*CHANNEL 13—December 1 1991*

10:00 p.m.

BOB BOUDREAUX:

Good evening, everyone, and thank you for joining us. It may very well be one of the biggest attempted insurance swindles in recent Houston history, the apparent con-

spiracy to fake the death of a Houston man with criminal troubles and millions of dollars in life insurance.

The question raised tonight is what role did mayoral candidate Sylvester Turner play in this insurance fraud? Tonight our Wayne Dolcefino has this exclusive 13 undercover investigation.

WAYNE DOLCEFINO:

In loving memory, the obituary read. It was June of 1986, and 30–year old Sylvester Clyde Foster, a male model and beauty salon owner, had died in a freak accident. Two companions claimed Foster had fallen off a sail boat and into the waters of the Gulf of Mexico six miles south of Galveston. The Coast Guard searched but the body was never found.

This week, 13 Undercover learned Sylvester Foster was very much alive and in prison in Salamanca, Spain, under an alias, Christopher Lauren Fostier. Fostier had been arrested after allegedly delivering two kilos of cocaine to a Spanish undercover agent.

Dwight Thomas was said to be Foster's closest friend here in Houston. We asked him on Thanksgiving morning about Foster's miraculous return from the grave.

DWIGHT THOMAS:

Prison, Spain?

SPEAKER:

Uh-huh.

DWIGHT THOMAS:

Prison, Spain? Prison, Spain?

SPEAKER:

Sylvester Clyde Foster.

DWIGHT THOMAS:

I know who you're speaking of. I know nothing about prison and Spain.

SPEAKER:

You don't know that he's alive and he's in prison?

DWIGHT THOMAS:

No.

WAYNE DOLCEFINO:

We found Thomas at his home in Inwood Forest, a home he shares with mayoral candidate Sylvester Turner. It's the home Turner has been leasing inside the city limits since he announced plans to run for mayor. The candidate claims the news about Foster was news to him, too.

SYLVESTER TURNER:

That guy died more than five or six years ago.

SPEAKER:

He's not dead.

SYLVESTER TURNER:

As far as we all know. I mean, that's—he went overboard.

SPEAKER:

He's in Spain.

SYLVESTER TURNER:

Not as far as I know.

WAYNE DOLCEFINO:

Both Dwight Thomas and Sylvester Turner were deeply involved in the Sylvester Foster case and the attempt to get life insurance companies to pay off 6.5 million dollars in the wake of the disappearance. But did they know it was all a hoax, a scheme to swindle millions?

DWIGHT THOMAS:

No. I wouldn't set myself up for something crazy like that.

SPEAKER:

And Sylvester Turner didn't know?

DWIGHT THOMAS:

No. No. We never would have—in fact, as a matter of fact, we wouldn't have dealt with him at all if we had known that he was doing something out of the ordinary, beyond the premise of the law.

WAYNE DOLCEFINO:

But Thomas and Turner did deal with Sylvester Foster, even after learning he was the target of criminal investigations in early 1986, and they pursued the estate money even after significant evidence of a possible scam in Foster's death had already surfaced.

Dwight Thomas introduced Foster to his friend, attorney Sylvester Turner, in early 1986. And in June of that year, Turner drew up a will for Foster; the timing interesting.

On June 13 th, Sylvester Foster was indicted by a Houston federal grand jury for massive credit card fraud. On June 19 th, Foster rushed to sign the will in Turner's office, leaving the next day for a sail boat trip in the Gulf, despite what friends called his fear of the water.

June 22 nd, nine days after the indictment, three days after drawing up the will, Foster supposedly falls off the boat in another boat's wake and drowns. Curious? Get this: In the weeks before the bizarre accident, Foster had applied for an emergency passport, bought several luxury cars with life insurance policies attached, and amassed millions in life insurance coverage.

Despite the signs of something fishy, Sylvester Turner began the legal effort to get the millions in insurance money released and get mutual friend, Dwight Thomas, appointed as administrator over the estate. Thomas at first denied he sought control of Foster's estate until we told him about court documents we had viewed.

DWIGHT THOMAS:

The deal of it was, after he passed away, I found out that I was administrator of the estate.

WAYNE DOLCEFINO:

In fact, Thomas petitioned the court to become administrator. We then asked him why the evidence didn't make him suspicious.

DWIGHT THOMAS:

We looked into that. I didn't really know—actually, I really didn't want to get too deeply involved in it because I didn't know what was going on.

SYLVESTER TURNER:

There have been times we made out a will for individuals and they die for various reasons shortly thereafter. And you look at it and you say, well—you know, try and put together the circumstances by which it come about. I mean, it does happen.

WAYNE DOLCEFINO:

Turner also tried to block questioning of a female friend of Foster's in this case, Christina Batura, a woman promised a share of the money in the will. Batura died two years ago in an Hawaiian commuter plane crash, and Secret Service investigators now confirm they found letters and pictures that proved Batura knew Foster was alive, as she tried to collect on his death, and Turner helped her.

And investigators say they have statements that Turner's close friend, Dwight Thomas, threatened at least one witness who had told authorities Foster was alive. Thomas denies he was part of any scam.

DWIGHT THOMAS:

No. No. No. No. No. Undoubtedly no.

WAYNE DOLCEFINO:

Sylvester Turner pursued the estate case for a year, until a judge removed him from the case over Turner's protest, citing conflicts of interest. In November of 1987, Turner tried to collect more than $28,000 in legal fees from the still unsettled estate for his work. The bill was rejected.

Thomas never gained control of the estate. And only one of nine insurance companies ever paid off any money in Foster's death. And that money went to his father. The mayoral candidate questions the timing of the revelations and claims he, too, was a victim, not part of any conspiracy to conceal Foster's European get-away.

SYLVESTER TURNER:

Sylvester Turner is the one that's been left with the bill.

WAYNE DOLCEFINO:

But if that's true, then Sylvester Turner was duped by overwhelming evidence and at least two legal clients with close ties to one of his closest friends.

SYLVESTER TURNER:

You told me the man is a liar. The man ought to come back here and be dealt with, if that's the case. If, in fact, he is, then he ought to be dealt with in the severest of terms.

SPEAKER:

Do you feel used by him?

SYLVESTER TURNER:

Yeah.

WAYNE DOLCEFINO:

Sylvester Turner claims he fully cooperated with all of the investigations into Foster's disappearance, but at least three investigators very close to this case tell us

that's simply not true. Wayne Dolcefino, 13 Eyewitness News.

BOB BOUDREAUX:

Now, tonight, Sylvester Turner called a news conference to attack that story as factually false, untrue, and misleading.

SYLVESTER TURNER:

When I have looked at the facts of this case and when you look at them, I think you will conclude that this is an all-time low in Houston politics. And I resent the fact that five days before the campaign, that these type of assertions are being made by anyone with reference to my character and my integrity.

BOB BOUDREAUX:

Turner claims the Foster story was hand-delivered to Channel 13 by opponent Bob Lanier's campaign, and within the last hour, the Lanier campaign reacted.

CRAIG VAROGA:

I think it's ridiculous that every time there's a story in the newspaper or on TV that raises serious questions about Sylvester Turner's public record, that he blames the Bob Lanier campaign.

BOB BOUDREAUX:

Reporter Wayne Dolcefino and Channel 13 stand by the story.